IN THE UNITED STATES SCHOOL DISTRICT COURT
FOR THE EASTERN SCHOOL DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TROY SOUDERS, *et al.*, <br><br>     *Plaintiffs*, <br><br> v. <br><br> THE SCHOOL DISTRICT OF PHILADELPHIA, <br><br>     *Defendant*. | CIVIL ACTION <br> NO. 18-2167 |

**PAPPERT, J.**                                                                                                                           October 19, 2018

**<u>MEMORANDUM</u>**

      Troy Souders, Melissa McCullough and their son Elijah Souders sued the School District of Philadelphia for disability discrimination under the Rehabilitation Act of 1973, the Americans with Disabilities Act and the Pennsylvania Human Rights Act. The District allegedly failed to place Elijah in an appropriate school, given his need for special education and related services. Elijah contends the School District did not accommodate his disabilities, isolating him and setting his education back. His parents allege the District discriminated against them based on their association with their son. The School District moves for judgment on the pleadings as to the parents' claims. The Court grants the Motion because, as more fully explained below, Elijah's parents do not meet the standing threshold for associational discrimination claims under the ADA and RA.

I

      Elijah suffers from visual and hearing impairment and chronic renal failure, which requires dialysis three times per week. (*Id.* at ¶¶ 7–8.) He and his parents

moved to Philadelphia in April of 2014 when Elijah was fifteen. (*Id.* at ¶ 6.) The School District did not enroll Elijah in school for the remaining months of the 2013–2014 school year or offer him summer school services in 2014. (*Id.* at ¶¶ 6, 24, 25.)

Beginning in the fall of 2014, the School District made several unsuccessful attempts to place Elijah in school. It enrolled Elijah in Furness High School in October of 2014, but the school could not accommodate him due to his disabilities. (*Id.* at ¶¶ 26–27.) In December, the School District enrolled him in Overbrook Education Center, a K–8 school, which required him to repeat the eighth grade. (*Id.* at ¶¶ 28–30.) In June, the School District sent applications to three high schools on Elijah's behalf. (*Id.* at ¶ 33.) Only one, located over thirty miles from Elijah's home, accepted his application. Feeling such a commute was too long for Elijah, his parents declined to send him there. (*Id.* at ¶¶ 34–36.) Elijah was not enrolled in another school until April 3, 2017. (*Id.* at ¶ 42.)

Elijah alleges that the School District denied him access to its facilities and services for nearly two years, and that he suffered emotionally during that period from physical and social isolation, as well as financially due to his lack of schooling and delayed progress toward independence. (*Id.* at ¶¶ 43, 44, 47–49.) Elijah's parents allege that they lost the right to participate in Elijah's education, suffered physical and social isolation while caring for Elijah during the nearly two-year period when he was not in school, lost quality of life (both for themselves and Elijah's older sister), earnings, employment opportunities and independence, suffered financially because caring for Elijah interfered with their work, and that Elijah's delayed progress toward independence increased their future costs and expenses. They also claim a loss of consortium. (*Id.* at

2

¶¶ 50–53, 63–65.)

II

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). The same standard applicable to Rule 12(b)(6) motions to dismiss applies to Rule 12(c) motions for judgment on the pleadings. *Zimmerman v. Corbett*, 873 F.3d 414, 417 (3d Cir. 2017), *cert. denied*, 138 S. Ct. 2623 (2018).

To survive dismissal under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

*Twombly* and *Iqbal* require the Court to take three steps to determine whether a complaint will survive a motion to dismiss. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016). First, it must "take note of the elements the plaintiff must plead to state a claim." *Id.* (quoting *Iqbal*, 556 U.S. at 675). Next, it must identify the allegations that are no more than legal conclusions and thus "not entitled to the assumption of truth." *Id.* (quoting *Iqbal*, 556 U.S. at 679). Finally, where the complaint includes well-pleaded factual allegations, the Court "should assume their

3

veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679). This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (quoting *Connelly*, 809 F.3d at 786–87).

III

Both the ADA and RA allow non-disabled individuals to bring discrimination claims "based on their association with disabled individuals." *Addiction Specialists, Inc. v. Twp. of Hampton*, 411 F.3d 399 (3d Cir. 2005).

Title III of the ADA provides that it is "discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual . . . because of the known disability of an individual with whom the individual . . . is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).[1] Under this provision, a plaintiff "must plausibly allege: (1) a logical and significant association with an individual with disabilities; (2) that a public entity knew of that association; (3) that the public entity discriminated against them because of that association; and (4) they suffered a direct injury as a result of the discrimination." *S.K. v. N. Allegheny Sch. Dist.*, 146 F. Supp. 3d 700, 712 (W.D. Pa. 2015) (citing *Schneider v. Cty.of Will*, 190 F. Supp. 2d 1082 (N.D. Ill. 2002).

---

[1] The PHRA, like the ADA, makes it unlawful to "[e]xclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations or other opportunities to a person because of the handicap or disability of an individual with whom the person is known to have a relationship or association." 43 Pa. Stat. Ann. § 955. The Court will apply the same statutory standing requirements to Plaintiffs' PHRA and ADA claims. *See Abdul-Latif v. Cty. of Lancaster*, 990 F. Supp. 2d 517, 533 (E.D. Pa. 2014) (quoting *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir.1996)) (interpreting the PHRA "in accord with" the ADA).

4

The RA provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The RA extends "[t]he remedies, procedures, and rights" under that provision "to any person aggrieved by any act or failure to act" by the entity subject to the RA. *Id.* at § 794a(a)(2).

The parties agree that non-disabled persons have standing to bring associational discrimination claims under the ADA if they allege that they were personally excluded, personally denied benefits or personally discriminated against because of their association with a disabled person. They disagree, however, on the standing requirements for associational discrimination claims under the RA. Specifically, Elijah's parents contend that as "persons aggrieved," they need only establish that they suffered injuries independent from Elijah's and causally related to the School District's denial of access to its facilities and services for Elijah. The District contends that the RA's associational standing requirements are equivalent to those of the ADA. The issue is therefore whether the threshold for associational standing under the RA is the same or broader than that of the ADA.

A

Two circuit courts of appeals have squarely confronted the question, both times in the context of the failure by hospitals to provide interpreters to deaf patients, and decided it differently. *Compare Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268 (2d Cir. 2009), *with McCullum v. Orlando Reg'l Healthcare Sys., Inc.*, 768 F.3d 1135 (11th Cir. 2014).

5

In *Loeffler*, a divided panel of the Second Circuit Court of Appeals reversed the district court's grant of summary judgment to the hospital on associational discrimination claims brought under the RA. In that case, the non-disabled children of a deaf hospital patient alleged they were forced to provide sign language interpretation, miss school and be exposed to their father's suffering when the hospital repeatedly failed to provide a sign language interpreter for their father. *Loeffler*, 582 F.3d at 280. The court found that the children sufficiently alleged they were "person[s] aggrieved" within the meaning of the RA and thus had standing to bring an associational discrimination claim. *Id.* at 279. The court reasoned that because the standing provision of the RA, § 794a(a)(2), is distinct from the provision prohibiting discriminatory conduct, § 794(a), non-disabled plaintiffs do not need to allege that they were subject to discrimination themselves. *Id.* It held rather that the "broad language" of the standing provision shows that Congress intended to define standing "as broadly as possible under the Constitution, irrespective of § 794(a)." *Id.* (quoting *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 47). Thus, to allege statutory standing under the RA, plaintiffs must establish an injury causally related to, and independent from, a disabled person's injuries. *Id.* at 280. The court stated the Loeffler children's alleged injuries were "independent of" the injuries their father suffered. *Id.* at 280.

The dissent, however, felt the majority read the phrase "any person aggrieved" too broadly, thereby granting standing to the Loeffler children despite the fact that they were "never excluded from participation in, denied services or subject to discrimination" themselves. *Id.* at 285. The dissent argued that Congress intended courts to read the

6

RA and ADA together, and that the later-enacted ADA "clarified the standing requirement that associated persons be themselves actually excluded or denied" services. *Id.* at 286.

In *McCullum*, the parents and sister of a deaf patient, D.F., alleged that they "suffered an injury independent from D.F.'s injury when [hospitals] relied on them to help communicate with D.F." *Id.* The Eleventh Circuit rejected *Loeffler*'s reasoning and affirmed the district court's dismissal of the claims for lack of statutory standing. The court held that "non-disabled persons have standing to seek relief under either the RA or ADA only if they allege that they were personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." *Id.* at 1142–43. The court acknowledged that the scope of the standing provision of the RA is less clear than that of the ADA. *Id.* at 1142. It found, however, that "statutory context does limit the scope" of the phrase "any person aggrieved"; the conduct proscribed by § 794(a) "is what the statute makes unlawful," and a party is aggrieved under the RA only if he or she was subject to that conduct. *Id.* at 1143. The court thereby concluded that the threshold for associational standing under the RA and the ADA is the same, and the alternative "would mean that Congress granted non-disabled persons more rights . . . than it granted to disabled persons." *Id.*

While the Third Circuit Court of Appeals has not yet decided this issue in a precedential opinion, a panel of that court in a non-precedential ruling upheld a district court's dismissal of an associational discrimination claim brought by the parents of a child who, because of incidents at school related to his disabilities, had been detained in a juvenile facility. In *R.S. v. Butler County*, 700 Fed. App'x 105 (3d Cir. 2017), the

7

parents contended that although they were not disabled, they too suffered disability discrimination because of their association with their son. *Id.* at 109. The parents alleged that they suffered continued emotional distress, engaged in family therapy and had "difficulties working through the anxiety and trauma" caused by their child's removal from home and detention. *Id.* at 110. Pointing out that the remainder of the complaint's allegations focused solely on the discrimination their disabled son faced, the court found the complaint "devoid of factual allegations from which we may plausibly infer that the parents were personally excluded from participation in or denied the benefits of a covered activity or subjected to discrimination because of their son's disability." *Id.* at 109–10. The court applied the statutory standing threshold set forth in *McCullum* to both the ADA and RA claims and concluded that the parents failed to meet it. *Id.*

B

*McCullum*, not *Loeffler*, presents the correct analysis and articulates the appropriate statutory standing requirements for associational discrimination claims under these two statutes.[2] Accordingly, to survive the School District's Motion, Elijah's parents must plead facts which, accepted as true, allow the Court to draw the reasonable inference that they were "personally excluded, personally denied benefits, or personally discriminated against because of their association with a disabled person." *Price v. Commonwealth Charter Acad.-Cyber*, No. CV 17-1922, 2018 WL 2288478 (E.D.

---

[2] Since *McCullum*, our Court and other district courts have also held that the threshold for associational standing under the ADA and RA is the same. *See, e.g.*, *T.C. v. Hempfield Area Sch. Dist.*, No. CV 17-1507, 2018 WL 3707419 (W.D. Pa. Aug. 3, 2018); *Price v. Commonwealth Charter Acad.-Cyber*, No. CV 17-1922, 2018 WL 2288478 (E.D. Pa. May 17, 2018); *K.K. v. N. Allegheny Sch. Dist.*, No. CV14-218, 2017 WL 2780582 (W.D. Pa. June 27, 2017); *S.K. v. N. Allegheny Sch. Dist.*, 146 F. Supp. 3d 700, 717 (W.D. Pa. 2015).

8

Pa. May. 17, 2018) (quoting *McCullum*, 768 F.3d at 1143). "Such discrimination requires a separate and distinct denial of a benefit or service to a non-disabled person; it may not be premised on a derivative benefit or harm based on treatment towards a disabled person." *United States v. Nobel Learning Communities, Inc.*, No. CV 09-1818, 2010 WL 1047730, at *4 (E.D. Pa. Mar. 19), *as amended* (Mar. 24, 2010); *accord United States v. Nobel Learning Communities*, No. CV 17-366 (NLH/JS), 2017 WL 4697050, at *8 (D.N.J. Oct. 19, 2017), *reconsideration denied*, No. CV 17-366 (NLH/JS), 2018 WL 2134034 (D.N.J. May 9, 2018).

Here, as in *R.S.*, the Complaint focuses on an act of discrimination toward Elijah. It does not allege facts from which the Court could reasonably infer that Elijah's parents were personally excluded from or personally denied benefits the School District was obligated to provide them or personally discriminated against by the School District because of their association with Elijah. Their alleged emotional and financial injuries, physical and social isolation and loss of consortium derive from Elijah's own exclusion from school.

Although they conclusorily allege they were denied the right to participate in Elijah's education, they have not alleged that the School District acted to deny them a benefit separate and distinct from the benefit Elijah was denied. To the extent such a claim could be independent of the alleged discrimination against Elijah, the only alleged fact that could support their conclusion is that the School District did not contact them to discuss placement options for Elijah after they declined to send him to a school over thirty miles from their home. (Compl. ¶¶ 36–38.) This lawsuit focuses on various schools' rejection of applications made by the School District on Elijah's behalf;

9

the Complaint concerns the District's inability or unwillingness to accommodate Elijah's disabilities, not shutting his parents out of the process.

This case is distinguishable from those relied on by Elijah's parents, including *T.C. v. Hempfield Area School District*, No. CV 17-1507, 2018 WL 3707419, (W.D. Pa. Aug. 3, 2018), *S.K. v. North Allegheny School District*, 146 F. Supp. 3d 700 (W.D. Pa. 2015) and *United States v. Nobel Learning Communities*, No. 1:17-CV-366 (NLH/JS), 2017 WL 4697050, at *9 (D.N.J. Oct. 19, 2017), *reconsideration denied*, No. 1:17-CV-366 (NLH/JS), 2018 WL 2134034 (D.N.J. May 9, 2018). In *T.C.*, a mother alleged that her child's school "intentionally kept critical information from [her] in order to prevent her from using that information at an IEP team meeting" and thus denied her the benefit of "meaningful participation in" those meetings. 2018 WL 3707419, at *10. Denying the school district's motion to dismiss her ADA and RA associational discrimination claims, the court found her allegation "indicative of a direct and distinct harm to [the mother] as it would show that the School District's conduct was *directed specifically towards [her]*." *Id.* at *10 n.3 (emphasis added) (adding that "allegations that the School District told [her] she was not permitted to participate in an IEP team meeting or that the School District failed to invite her to IEP team meetings, or otherwise intentionally interfered with her ability to participate" would have also indicated direct and distinct harm to her). On the pleadings, the court had to "presume[] that [she was] entitled to participate in IEP team meetings as a right and benefit separate and apart from the benefit [her child] received from [her] participation." *Id.* at *10.

In *S.K.*, a boy's mother alleged associational discrimination after the school district refused to transport her son to a daycare center capable of meeting his medical

needs. 146 F. Supp. 3d at 704. The court found that the "benefit [of transportation services] is provided to the guardians—like [the mother]—of the students," rather than the students themselves. *Id.* at 713. It affirmed the dismissal of the son's discrimination claim but granted the mother leave to amend her own associational claim because she alleged "she was *personally* discriminated against on the basis of [her son's] disabilities and actually excluded from receiving access to the transportation service" to which she, not her son, was entitled. *Id.* at 715–16 (emphasis in original).

In *Nobel Learning Communities*, parents successfully alleged associational discrimination when a daycare service expelled their disabled daughter. 2017 WL 4697050, at *9. The parents claimed they were denied the benefits of daycare which were available to parents of non-disabled children. *Id.* at *8. The court found they had plausibly alleged associational discrimination under the ADA because "daycare services exist for parents to have temporary relief from providing constant care for a young child, regardless of what a parent might use that time for," and those services, "while centered around the child, are as much a benefit to parents." *Id.* at *8–9.

Here, at all relevant times in the Complaint, Elijah was a young man between the ages of fifteen and eighteen who was allegedly discriminated against by the School District when it failed to accommodate him in an appropriate school because of his disabilities. School is not daycare and its purpose is to educate students and, as Elijah expects, continue his "progress toward independence." Though many parents, not just Elijah's, may come to view schools as institutions which provide respite from caring for their children and give them some enhanced social and occupational opportunities, those are (unlike daycare) not reasons why parents send their children to school.

Elijah's parents were not excluded from or denied a benefit the School District was obligated to provide them. The School District is obligated to educate Elijah, and it allegedly denied Elijah, not his parents, that service.

An appropriate order follows.

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.